

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANSICO**
**No.**

FILED

APR 03 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Dr. Calvin Norton | ) | |
| Plaintiff; | ) | **COMPLAINT** |
| | ) | |
| -VS- | ) | **JURY TRIAL DEMAND** |
| | ) | |
| Meta Paltforms, Inc., (dba FACEBOOK) | ) | **CV26-02914 AGT** |
| Defendants; | ) | |

## I. JURISDICTION AND VENUE

1. Venue is proper under 28 U.S.C. § 1391 because Meta's headquarters (Menlo Park, CA) resides in this district and a substantial portion of the conduct occurred herein. *see Daimler AG v. Bauman*, 571 U.S. 117 (2014).

2. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

4. This Court may exercise specific personal jurisdiction over Defendant Meta Platforms, Inc., because it has purposefully directed business activities toward this forum.

5. Defendant Meta operates an interactive platform with millions of users in this State and other states where subsequent defendants who harmed this plaintiff are sued and held liable by a federal court on March 11, 2026. *see Dr. Calvin Tyrone Norton vs Harold C. Turrentine, et als case 1:25-cv-00099-GHD-DAS* [DE-31].

1. Defendant Meta Platforms, Inc., sells targeted advertising to users located in this State, collects and monetizes user data from residents of this State, and actively distributes content into this State through algorithmic amplification.

2. Plaintiff's claims arise directly from Meta's conduct in this forum, including distribution of defamatory content to users located within the State and algorithmic promotion of harmful content targeting Plaintiff's reputation.

3. Under the "effects test" established in Calder v. Jones, 465 U.S. 783 (1984) Defendant's conduct was intentional, expressly aimed at the forum and causing harm primarily suffered within the forum.

4. Exercising jurisdiction comports with traditional notions of fair play and substantial justice under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

## II. PARTIES

5. Plaintiff Dr. Calvin Norton is a private citizen of the United States residing in the State of North Carolina, public figure, civil rights leader, online content blogger on Facebook who have been targeted, intimidated, and aggrieved by the defendant.

6. Defendant Meta Platforms, Inc., corporate Headquarters principal office, is located at 1 Meta Way Menlo Park, CA 94025 and listed at 1601 Willow Road, Menlo Park, CA 94025.

7. Defendant Meta Platforms, Inc., is incorporated in the State of Delaware with its registered agent Corporation Services Company (CSC) 251 Little Falls Drive, Wilmington, DE 19808.

## III. FACTUAL ALLEGATIONS

8. Plaintiff is a nationally recognized gospel music executive and public figure.

9. Defendants engaged in a coordinated campaign of publishing and amplifying false and defamatory content.

10. William G. McCray III took upon his social media account April 18, 2025, to blackmail the victim to contact him before he released the story on Meta Platforms, INC. *(see* https://www.facebook.com/share/p/16X9Lk77MY/?mibextid=wwXIfr).

11. On or about Easter Saturday April 19, 2025,William G. McCray III exposed intimate visual materials depicting intimate parts exposed with sexual engagement videos without the effective consent of Cadarius D. Price Forrest City, Arkansas to the Plaintiff and sold them for a $5 subscription through Facebook app and with the intent to harm victim and the prohibited dissemination of the sexual explicit materials. See https://www.facebook.com/share/p/1CBWnYUFHz/?mibextid=wwXIfr/ https://www.patreon.com/ObnoxiousWithSirWilliam?utm_campaign=creatorshare_creator)

12. Thereafter on April 21, 2025, at 8:00 pm central, Harold C. Turrentine and Demario Q. Jives maliciously sought retaliation against William McCray by posting nude and implicit pictures online to the Plaintiff through Facebook app for millions to view without McCray's consent. (see https://www.facebook.com/share/v/18GheFa3Tq/?mibextid=wwXIfr ).

13. After receiving the evidence of crimes committed by these parties on the morning of April 24, 2025, Plaintiff posted a video of him at the Atlanta Police Department to notify Georgia authorities of the online criminal offenses.

14. On April 24, 2025, at 9:00 pm central, Harold C. Turrentine and Demario Q. Jives went on social media Facebook to retaliate against this Plaintiff by creating false statements of accusing Plaintiff of felony crimes of drugs which are not true.

15. On April 25, 2025 at 2:30 pm central, Defendant Harold C. Turrentine lashed out in a video created by him and he posted onto Meta Platforms of Facebook making accusing

statements that Plaintiff have stolen a tour bus from Gospel artist Doc McKenzie, that Plaintiff has stolen his home located of 206 Anderson Street, Whiteville, NC 28472, and that Plaintiff has stolen a Church which he is the Pastor that were not true (see video 56:05-1:23:50 see https://www.facebook.com/share/v/17sPzWdvZP/ ).

16. On April 27, 2025, at 12:25am central the Harold C. Turrentine created another video of Facebook to disclosure intimate visual materials depicting intimate parts exposed to the public of the Plaintiff's necked butt lying in the bed asleep without consent, he falsely stated that Plaintiff is feloniously laundering money in Mexico, that Plaintiff stole a home from a mentally changed person, Plaintiff has stolen a church, that Plaintiff was sent a letter of cease and desist from the Stellar Awards which is untrue, and that Plaintiff is involved in payola to Radio Stations which is not true in violation of a crime per *47 US. Code § 508 (a). (see video https://www.facebook.com/share/v/1E4hixyyKw/?mibextid=wwXIfr) (21:45-23:50, 46:30-47:45, and 1:06:00-1:08:00.*

17. Felicia A. Boone secretly took a picture of this Plaintiff approximately three to five years ago without consent while he was asleep at his private location, disclosure intimate visual materials, and depicting intimate parts exposed of the Plaintiff's butt to Harold Turrentine on April 27, 2025, to retaliate against this Plaintiff after someone on Facebook stated to report her misconduct to the nursing board.

18. That morning of April 25, 2025, Felicia Boone texted Plaintiff to give out pictures on her phone and that her phone will show Plaintiff.

19. Felicia A. Boone committed a criminal offense when she intentionally threatens to disclose, without the consent of the depicted Plaintiff, visual material depicting the Plaintiff with the Plaintiff's intimate parts exposed or released to Harold Turrentine or third party.

20. It's believed that Defendant Feleicia A. Boone used her cellphone device and released the depicted picture of Plaintiff through Meta Platforms/FACEBOOK messenger to Harold Turrentine.

21. At all times the relevant Plaintiff has never consented to any defendants or party(ies) taking nude pictures nor disclose or any publication of his body parts.

22. The plaintiff had no idea that any defendants would have secretly had access to snap or video pictures of him.

23. That any taking of nude or implicit photos, sharing of materials or videos, publication online to Facebook without consent, and releasing to third parties warrant criminal charges against defendants.

24. The Plaintiff contacted Meta Platforms, Inc. by and through Facebook app and sought the removal of all defamation and damage information and Facebook refused to remove content. *(see Barnes v. Yahoo!, 570 F.3d 1096 (9th Cir. 2009).*

25. Meta Platforms, Inc., did not act as a passive publisher.

26. Instead, Meta recommended the content through its algorithm, amplified the content to target audiences, monetized engagement from the defamatory material, and continued distribution after notice of falsity.

27. Meta's systems ensured the content reached users in Plaintiff's primary market, industry professionals, and religious and music communities tied to Plaintiff's profession.

28. Meta's algorithmic systems actively selected and promoted harmful content, increased visibility beyond original publication, and targeted specific audiences likely to engage.

29. Meta's conduct constitutes material contribution to the development of the content. *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008).

### IV. COUNT ONE- DEFAMTION PER SE AGAINST META

30. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

31. Defendant Meta Platforms, Inc. ("Meta"), through its Facebook platform, knowingly published, republished, distributed, and materially amplified false statements of fact concerning Plaintiff to millions of users.

32. The statements disseminated through Meta's platform falsely accused Plaintiff of criminal conduct, including but not limited to drug-related felony activity, theft of property, including a home, church, and tour bus, financial crimes, including alleged money laundering, and illegal payola practices in violation of federal law.

33. These statements constitute defamation per se under well-established law because they impute the commission of serious crimes, injure Plaintiff in his profession as a gospel music executive and minister, subject Plaintiff to public hatred, ridicule, and contempt.

34. Meta is not entitled to immunity under 47 U.S.C. § 230(c)(1) because it acted as an information content provider, in whole or in part, within the meaning of 47 U.S.C. § 230(f)(3).

35. Meta materially contributed to the creation and development of defamatory content by designing and deploying algorithmic systems that prioritized, recommended, and amplified the defamatory content, actively targeting distribution to users within Plaintiff's professional and geographic communities and increasing reach through engagement-based ranking systems that elevated harmful content.

36. Meta's conduct goes beyond traditional publishing functions and constitutes content development, as recognized in *Fair Housing Council v. Roommates.com,* LLC, 521 F.3d 1157 (9th Cir. 2008) (platform liable where it materially contributes to unlawfulness).

37. Meta's algorithms did not passively display content, but instead selected, promoted, and optimized defamatory material for maximum visibility and engagement, thereby transforming Meta into a co-developer of the content.

38. Meta affirmatively recommended and pushed the defamatory content through News Feed ranking systems, suggested content features, and notifications and engagement prompts.

39. These systems were designed to increase virality, foreseeably causing rapid and widespread dissemination, and targeted reputational harm to Plaintiff.

40. Such conduct satisfies the "development" standard under Section 230, as Meta enhanced the harmful nature and reach of the defamatory content.

41. Meta received actual notice of the defamatory and unlawful content, including false criminal accusations, non-consensual intimate imagery, harassing, and retaliatory publications.

42. Despite such notice, Meta failed to remove the content in a timely manner, continued to allow, promote, and monetize the content and permitted ongoing republication and amplification.

43. After notice, Meta's continued distribution constitutes independent tortious conduct, removing it from Section 230 protection.

44. Meta profited directly from the defamatory content by selling targeted advertisements placed alongside the content, monetizing engagement through increased user interaction and benefiting from paid subscription and promotional features tied to the content.

45. By financially benefiting from the defamatory material, Meta became an active participant in the exploitation and dissemination of unlawful content.

46. Meta is liable under the doctrine of republication, as it re-distributed the defamatory statements to new audiences, re-promoted content through algorithmic resurfacing, and continued publication after knowledge of falsity.

47. Each act of algorithmic amplification constitutes a new publication, giving rise to separate liability.

48. Meta acted with actual malice by knowing the statements were false or acting with reckless disregard for their truth, ignoring clear evidence of falsity and unlawful conduct, continuing to promote the content despite foreseeable harm.

49. Meta's business model prioritizing engagement over truth demonstrates reckless disregard for Plaintiff's rights and reputation.

50. As a direct and proximate result of Meta's conduct, Plaintiff has suffered severe reputational harm in the gospel music industry, loss of business opportunities, endorsements, and professional relationships, emotional distress, humiliation, and mental anguish.

51. Because the statements constitute defamation per se, damages are presumed.

52. Meta's conduct was willful, wanton, and malicious, entitling Plaintiff to compensatory damages, punitive damages, and injunctive relief requiring removal of all defamatory content

## V. FALSE LIGHT INVASION OF PRIVACY

53. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Defendant Meta Platforms, Inc. ("Meta"), through its Facebook platform, publicized information and content placing Plaintiff in a false light that would be highly offensive to a reasonable person.

55. Meta, through its platform and systems, widely disseminated and republished false narratives portraying Plaintiff as a criminal engaged in drug activity, thief of property, including a home, church, and tour bus, a participant in illegal financial schemes, including money laundering, and an unethical actor engaged in unlawful payola practices.

56. These portrayals are false, misleading, and materially distorted, and they created a false public image of Plaintiff that is fundamentally inconsistent with his true character and professional standing.

57. Meta's platform broadcast these false portrayals to millions of users, including individuals within Plaintiff's professional music industry network, religious and ministry community, and geographic market and audience base.

58. The false light in which Plaintiff was placed would be highly offensive to any reasonable person, particularly where plaintiff is a public figure, gospel executive, and minister.

59. The accusations directly undermine Plaintiff's moral integrity and religious leadership.

60. The content includes false criminal allegations and reputational attacks.

61. The widespread dissemination of these false portrayals subjected Plaintiff to public humiliation, scorn and ridicule and severe reputational harm.

62. Meta is not immune under 47 U.S.C. § 230 because it materially contributed to and developed the false portrayal of Plaintiff, including by algorithmically selecting and promoting the content to maximize reach, targeting Plaintiff's specific audience and professional community, and amplifying visibility through engagement-driven systems.

63. Meta's conduct constitutes creation or development of unlawful content, consistent with Fair Housing Council v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008).

64. Meta's systems transformed isolated posts into widespread false narratives, thereby constructing and reinforcing the false light in which Plaintiff was portrayed.

65. Meta acted with knowledge or reckless disregard as to the falsity of the publicized matter by receiving notice of the false and defamatory content, failing to remove or limit the content, and continuing to distribute and promote the content.

66. Meta's continued publication after notice demonstrates reckless disregard for the truth and for Plaintiff's rights, satisfying the fault standard required for false light claims involving public figures.

67. After receiving notice, Meta continued to republish and redistribute the content, allowed its algorithms to resurface and re-promote the content, and enabled ongoing visibility and engagement.

68. Each act of continued amplification constitutes a new publication placing Plaintiff in a false light, creating independent liability.

69. As a direct and proximate result of Meta's conduct, Plaintiff has suffered severe damage to reputation and public image, loss of professional opportunities and business relationships, and emotional distress, embarrassment, and humiliation.

70. Meta's actions were intentional, willful, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to compensatory damages, punitive damages, and injunctive relief.

## VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendant Meta Platforms, Inc.)

71. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72. Defendant Meta Platforms, Inc. ("Meta"), through its Facebook platform, engaged in extreme and outrageous conduct that exceeds all bounds of decency tolerated in a civilized society.

73. Meta's conduct includes but is not limited to knowingly distributing and amplifying false criminal accusations against Plaintiff, allowing and promoting non-consensual intimate images and videos depicting Plaintiff's exposed body, algorithmically targeting and pushing harmful content to Plaintiff's professional, religious, and community networks, continuing to republish and promote the content after receiving notice of its falsity and unlawfulness.

74. Meta's actions were not passive. Instead, Meta designed systems to maximize engagement with harmful and sensational content, elevated defamatory and invasive material for increased visibility and virality and facilitated repeated exposure of Plaintiff to humiliation and reputational destruction.

75. The dissemination of false criminal allegations combined with the publication of intimate; non-consensual imagery constitutes conduct so outrageous and intolerable that it satisfies the IIED standard under applicable law.

76. Meta acted intentionally or with reckless disregard of the high probability that its conduct would cause severe emotional distress to Plaintiff.

77. Meta knew or should have known that publishing false allegations of criminal activity would severely harm Plaintiff's reputation, disseminating intimate images without consent would cause profound emotional trauma, and amplifying such content to Plaintiff's community would intensify harm.

78. Despite this knowledge, Meta continued to promote, distribute, and monetize the content, demonstrating a conscious disregard for Plaintiff's rights and well-being.

79. Meta is not entitled to immunity under 47 U.S.C. § 230 because Meta materially contributed to the harmful nature of the content through algorithmic amplification, Meta actively participated in the development and dissemination of the unlawful content, and Meta engaged in independent tortious conduct, including post-notice promotion and monetization.

80. Meta's actions fall within the exception recognized in Fair Housing Council v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008).

81. By transforming isolated posts into widespread, targeted attacks, Meta became a co-developer of harmful conduct, not merely a publisher.

82. Meta's conduct was the direct and proximate cause of Plaintiff's injuries.

83. The algorithmic amplification and repeated republication of the content increased the scope and severity of harm, extended the duration of Plaintiff's exposure, and intensified emotional distress.

84. As a direct result of Meta's conduct, Plaintiff has suffered severe emotional distress, including extreme humiliation and embarrassment, mental anguish and psychological trauma, anxiety, stress, and reputational devastation, and damage to personal dignity and emotional well-being.

85. The distress suffered by Plaintiff is severe, substantial, and enduring, far beyond what a reasonable person could be expected to tolerate.

86. Plaintiff is entitled to recover compensatory damages for emotional distress, punitive damages due to Meta's willful and reckless conduct, and injunctive relief to prevent further harm.

## VII. ALGORITHMIC AMPLIFICATION LIABILITY
### (Against Defendant Meta Platforms, Inc.)

87. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Defendant Meta Platforms, Inc. ("Meta"), through its Facebook platform, is liable for its independent conduct in designing, deploying, and operating algorithmic systems that amplified, promoted, and targeted harmful content concerning Plaintiff.

89. Meta developed and operates sophisticated algorithmic recommendation and distribution systems, including but not limited to news feed ranking algorithms, content recommendation engines, engagement optimization systems, notification and push alert systems.

90. These systems are designed to select, prioritize, and promote content based on engagement metrics, maximize user interaction, time-on-platform, and advertising revenue, amplify content likely to generate emotional responses, including outrage and controversy.

91. Meta's algorithms are not passive tools, but they constitute active, intentional systems that shape and control the dissemination of content.

92. Meta's algorithmic systems intentionally amplified defamatory and harmful content concerning Plaintiff by promoting the content to users most likely to engage with it, targeting Plaintiff's professional, religious, and geographic communities, and increasing the visibility of the content far beyond its original publication.

93. Meta's conduct resulted in exponential dissemination of false statements, repeated exposure of Plaintiff to damaging content, and entrenchment of false narratives in public perception.

94. This amplification was foreseeable and intended, given Meta's design to prioritize high-engagement content.

95. Plaintiff's claims arise from Meta's own conduct, not merely third-party content.

96. Meta's liability is based on its design and operation of algorithms that materially contributed to the harmful nature of the content, its affirmative acts of recommending, promoting, and

distributing the content, and its targeted delivery of harmful content to Plaintiff's professional network.

97. Such conduct falls outside the protections of 47 U.S.C. § 230, as it constitutes independent tortious behavior rather than passive publication.

98. Courts have recognized that platforms may lose Section 230 immunity where they materially contribute to the unlawfulness of content and develop or enhance the harmful nature of content. See *Fair Housing Council v. Roommates.com*, LLC, 521 F.3d 1157 (9th Cir. 2008).

99. Meta knew or should have known that its algorithmic systems would amplify false and defamatory content, promote harmful and invasive material, cause severe reputational and emotional harm.

100. Meta had the ability to limit distribution of harmful content, remove or demote content after notice, and prevent further amplification.

101. Despite this knowledge and capability, Meta failed to act, thereby breaching its duty of care.

102. After receiving notice of the defamatory and unlawful content, Meta continued to promote and distribute the content through its algorithms, allowed the content to resurface repeatedly through recommendation systems, and failed to implement reasonable safeguards to prevent further harm.

103. Post-notice amplification constitutes independent actionable conduct, separate from initial publication.

104. Meta's algorithmic amplification was a substantial factor in causing Plaintiff's injuries.

105. Without Meta's amplification the defamatory content would have had limited reach and that the harm to Plaintiff's reputation would have been significantly reduced.

106. Instead, Meta's systems transformed isolated posts into widespread reputational attacks.

107. As a direct and proximate result of Meta's algorithmic conduct, Plaintiff has suffered severe reputational damage, loss of business opportunities and economic advantage, emotional distress, humiliation and ongoing harm due to continued resurfacing content.

108. Meta's conduct was willful, reckless, and profit-driven, entitling Plaintiff to compensatory damages, punitive damages, and injunctive relief.

## VIII. TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Defendant Meta Platforms, Inc.)

109. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110. At all relevant times, Plaintiff Dr. Calvin Norton maintained valid contractual relationships and ongoing business expectancies, including but not limited to recording, promotion, and distribution agreements within the gospel music industry, radio servicing, airplay, and promotional relationships, concert bookings, touring agreements, and performance engagements, sponsorships, endorsements, and collaborative ventures, ongoing and prospective business relationships with artists, churches, promoters, and media platforms.

111. Plaintiff had existing contracts and a reasonable expectation of future economic benefit arising from his professional reputation as a nationally recognized gospel music executive and minister.

112. These relationships depended heavily on Plaintiff's reputation, integrity, and standing within the gospel and entertainment industry.

113. Defendant Meta Platforms, Inc. ("Meta") knew or should have known of Plaintiff's business relationships and economic expectancies because plaintiff's professional identity,

brand, and affiliations were widely known and visible on Meta's platform, Meta's systems collected and analyzed data reflecting Plaintiff's industry connections, audience, and engagement networks, and Meta specifically targeted distribution of content to Plaintiff's professional and community circles.

114. Meta intentionally and improperly interfered with Plaintiff's contractual and business relationships by publishing, republishing, and algorithmically amplifying false and defamatory content, disseminating content portraying Plaintiff as a criminal and unethical actor, and allowing and promoting non-consensual intimate imagery, further damaging Plaintiff's credibility and standing.

115. Meta's conduct was malicious and unjustified, as it served no legitimate purpose, violated industry norms and reasonable standards of conduct, and was designed or knowingly allowed to increase engagement at the expense of Plaintiff's reputation.

116. Meta's algorithmic systems targeted Plaintiff's professional audience, including industry executives, artists and collaborators, radio programmers, promoters, and religious and ministry communities.

117. By directing defamatory and harmful content to these audiences, Meta intentionally disrupted Plaintiff's business relationships and economic opportunities.

118. Meta is not entitled to immunity under 47 U.S.C. § 230 because Meta materially contributed to the development and amplification of the harmful content, Meta engaged in independent tortious conduct, including targeted distribution and monetization, and Meta acted beyond the role of a passive publisher by engineering and directing the interference

119. Meta's conduct satisfies the standard set forth in Fair Housing Council v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008).

120. By actively facilitating and enhancing the reach of defamatory content into Plaintiff's business network, Meta became a co-participant in the interference.

121. As a direct and proximate result of Meta's conduct Plaintiff's contracts and business relationships were disrupted, terminated, or materially harmed, prospective economic opportunities were lost or significantly diminished, and plaintiff suffered financial losses, reputational damage, and loss of goodwill.

122. Industry partners, clients, and collaborators were influenced by the false and damaging narratives disseminated through Meta's platform, leading to withdrawal, hesitation, or refusal to engage with Plaintiff.

123. Meta acted with malice, willfulness, and reckless disregard for Plaintiff's rights by continuing to promote harmful content after notice, prioritizing engagement and profit over truth and safety allowing repeated and ongoing interference with Plaintiff's livelihood.

124. Meta's conduct warrants the imposition of punitive damages.

### IX. INJUNCTIVE RELIEF
### (Against Defendant Meta Platforms, Inc.)

125. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

126. Plaintiff seeks temporary, preliminary, and permanent injunctive relief to prevent ongoing and irreparable harm caused by Defendant Meta Platforms, Inc. ("Meta").

127. Plaintiff has suffered and will continue to suffer irreparable injury absent injunctive relief, including ongoing damage to reputation and professional standing, continued dissemination of false and harmful content, loss of business opportunities and industry relationships, and emotional distress and public humiliation.

128. The harm to Plaintiff's reputation and goodwill is not fully compensable by monetary damages alone, particularly where content continues to circulate and resurface, false

narratives persist in public perception, and plaintiff's professional credibility is undermined in real time.

129. Plaintiff is likely to succeed on the merits of his claims, including defamation per se, false light invasion of privacy, intentional infliction of emotional distress, tortious interference, and algorithmic amplification liability.

130. Meta's conduct, including algorithmic promotion, targeted dissemination, and post-notice republication, constitutes independent actionable conduct not shielded by 47 U.S.C. § 230.

131. The balance of equities strongly favors Plaintiff because plaintiff faces ongoing and escalating harm, Meta faces minimal burden in removing or restricting unlawful content, and Meta has the technical capability to control, limit, and suppress harmful content through its systems.

132. Any burden on Meta is outweighed by the need to prevent continued harm and protect Plaintiff's rights.

133. Public interest is served by granting injunctive relief because it prevents the spread of false and defamatory information, protects individuals from reputational harm and privacy violations, and promotes accountability for platforms that amplify harmful and unlawful content.

134. Plaintiff seeks injunctive relief based on Meta's own conduct, including algorithmic amplification and targeted promotion, continued distribution after notice of falsity, and monetization of harmful content.

135. Because the requested relief targets Meta's conduct and systems, rather than treating Meta as a mere publisher, Section 230 does not bar injunctive relief.

136. Plaintiff respectfully requests that this Court issue a Temporary Restraining Order (TRO) and Preliminary Injunction requiring Meta to immediately remove all defamatory and invasive content concerning Plaintiff, disable further access to such content across all Meta platforms, cease algorithmic promotion, recommendation, or amplification of such content and prevent re-uploading or redistribution of the same or similar content

137. Plaintiff further requests that the Court enter a Permanent Injunction requiring Meta to permanently remove all content adjudicated as defamatory or unlawful, implement safeguards to prevent future publication or amplification of similar content, de-index, suppress, and prevent resurfacing of harmful content through its algorithms, and provide reasonable monitoring and enforcement mechanisms to ensure compliance.

138. Immediate relief is necessary because harm is ongoing and accelerating due to Meta's algorithmic systems, each day of continued publication compounds Plaintiff's damage, and delay will result in further irreparable injury.

## X. PRAYER FOR RELIEF

139. **WHEREFORE,** Plaintiff respectfully requests that this Court;

140. Issue a Temporary Restraining Order against Defendant Meta Platforms, Inc.;

141. Grant a Preliminary Injunction pending final resolution of this matter.

142. Enter a Permanent Injunction requiring removal and suppression of all harmful content;

143. Order Meta to cease algorithmic amplification of such content.

144. Require Meta to implement safeguards preventing future harm;

145. Award compensatory damages in an amount to be determined at trial.

146. Award punitive damages against the individual Defendants.

147. Award damages are up to $10,000,000.00 Dollars against the Defendants.

148. So triable by a jury.

149. Award costs, attorney's fees under 42 U.S.C. § 1988.

150. Grant such other relief as this Court deems just and proper.

On this the 31st day of March, 2026.

Dr. Calvin Norton, pro se
P.O. Box 1145
Whiteville, NC 28472
NORTONCALVIN@YAHOO.COM

State of North Carolina
County of Columbus

Dr. Calvin Norton

Sworn and Subscribed before me this day 31st, March, 2026 a Federal Legal Document with claims and grievances against several defendants.

Notary Public. Jewel J. Register

My Commission Expires, 8/6/2030

## XI. CERTIFICATE OF SERVICE

THIS SHALL CERTIFY that a copy of the Plaintiff's Summons and Complaint was served on these parties by electronic email and by depositing into the United States Postage Service as follows address to the parties of this action.

Meta Platforms, Inc.
Corporation Services Company (CSC)
251 Little Falls Drive

Meta CALIFORNIA 20

Wilmington, DE 19808

D. Sterling Kidd
One Eastover Center
P.O. Box 14167
100 Vision Drive, Suite 400
Jackson, MS 39236

On this the 31st day of March, 2026.

_____

Dr. Calvin Norton, pro se
P.O. Box 1145
Whiteville, NC 28472
NORTONCALVIN@YAHOO.COM